**EPIC METALS CORPORATION,**
Plaintiff,

v.

**CONSOLIDATED SYSTEMS,
INC., et al., Defendants.**

No. 96–1171–CIV–T–23C.

United States District Court,
M.D. Florida,
Tampa Division.

Aug. 21, 1998.

Gunn, Ogden & Sullian, P.A., Tampa, FL, for Epic Metals Corporation, Plaintiff.

Guillermo A. Ruiz, Law Offices of Guillermo A. Ruiz, St. Petersburg, FL, Joseph M. Killeen, L. Lawton Rogers, III, Rogers & Killeen, Alexandria, VA, for Consolidated Systems, Inc., Defendant.

Mark A. Brown, Andrew C. Greenberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Guillermo A. Ruiz, Law Offices of Guillermo A. Ruiz, St. Petersburg, FL, for Tampa Bay Arena, Ltd., Defendant.

Guillermo A. Ruiz, Law Offices of Guillermo A. Ruiz, St. Petersburg, FL, L. Lawton Rogers, III, Rogers & Killeen, Alexandria, VA, for Huber, Hunt & Nichols, Inc., Smi–Owen Steel Co., Inc., Defendants.

Frank R. Jakes, James W. Humann, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, ·P.A., Tampa, FL, Russell D. Orkin, Webb, Burden, Ziesenheim & Webb, Pittsburgh, PA, for Donald H. Landis, Counter–Defendant.

## ORDER

MERRYDAY, District Judge.

This case arises out of the defendants' alleged infringement of U .S. Patent No. 5,172,527 (" '527 patent") and a continuation-in-part patent, U.S. Patent No. 5,259,157 (" '157 patent"). Before the Court are the defendants' motion for partial summary judgment for a declaration of non-infringement of the '527 patent (Doc. 98) and the plaintiff's motion for partial summary judgment (Doc. 75). Both motions invite the Court to determine whether certain Consolidated Systems ("Consolidated") acoustic deck panels infringe patents held by Epic Metals Corporation ("Epic").

Epic manufactures and sells acoustic deck panel assemblies. The acoustic deck panel assemblies are commonly used to form the sound-deadening ceilings [1] of convention centers, arenas, and other cavernous structures. Originally, Fenestra Incorporated produced ceiling assemblies consisting of deck panels,

Frank R. Jakes, James W. Humann, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Tampa, FL, Lee Delton Gunn, IV,

---

1. The invention forms both the roof and ceiling of the structures in which it is installed. Howev-er, only the ceiling design and construction provide the sound-deadening qualities.

assembled side-by-side, end-to-end, or both. Alternating flat sections and rib sections, formed from sheets of steel, comprised the panels. The width of the flats generally exceeded the width of the ribs. Fiberglass insulation adjoined the metal, resting immediately above each flat section and between the rib sections. Roofing felt secured atop the rib sections and insulation completed the ceiling.

### Patent Prosecution History

Robert Ault[2] ("Ault"), the inventor of the '527 patent, discerned a need for a more easily produced metal roof deck panel assembly that retained or enhanced the acoustic qualities of existing products, such as Fenestra's. On or about May 31, 1991, Ault submitted to the Patent and Trademark Office ("PTO") an application for an "acoustic ceiling roof panel assembly", the product whose final iteration engendered this infringement action. Ault summarized his invention as:

a plurality of roof deck panels assembled in side-by-side and/or end-to-end relationships and secured to roof supports such as purlins[3] with each panel including a plurality of parallel and spaced apart perforated flat sections, with each flat section being separated from its adjacent flat section by a frusto-pyramidal rib section. The flat sections have width at least three times greater than the width of the rib as measured in the plane of the flat section and preferably a width five times greater than the width of the rib. Lengths of insulation are positioned within the ribs and atop a spacer means which spaces the insulation from the inner surface of the flats. The preferred spacer is a reticulated wire mesh positioned in contact with and between each of the perforated flat sections and the length of insulation positioned between adjacent ribs. The insulation is preferably fiberglass and the assembly has a noise reduction coefficient on the order of .95 to 1. There preferably are no perforations in the area of the ribs.

'527 Patent Application, Summary of the Invention. An illustration of the invention is found at Appendix A.

The patent application describes the preferred embodiment of the invention. Ault's submission contemplates 1,100 one-eighth inch diameter holes perforating each square foot of the flat section. The ribs consist of two diverging side walls adjacent to the flat section and connected to a top wall. The top wall of the ribs extends in a plane parallel to the plane of the flats.

The inventor's preferred embodiment establishes the width dimension of a flat as "at least three times and preferably five times greater than the width dimension of ribs as measured in the plane of the flat." '527 Patent Application, Preferred Embodiment. A flat width of 5½ inches and a rib width of 5/8 inch, "as measured in the plane of the flat," comprise the typical preferred embodiment of the roof deck panel. '527 Patent Application, Preferred Embodiment.

In relevant portion, the invention application claimed that "...each flat section [is] separated from its adjacent flat section by a rib section[ ] and [has] a width at least three times greater than the width of the rib section as measured in the plane of the flat section." '527 Patent Application, Independent Claims 1 & 11. Claim three[4], which depends from claim one, improved the invention by declaring a flat section width "at least 5 times greater than the width of the rib section as measured in the plane of the flat section." '527 Patent Application, Independent Claim 3.

The patent application contains drawings of perspective views of the entire assembly and section views of a portion of a roof panel unit. The initial drawings fail to disclose preferred flat and rib dimensions and lack visual directions for making dimension measurements.

**2.** Epic is the assignee of the '527 patent.

**3.** Purlins in a roof frame are longitudinal members that support common rafters or other roof sections.

**4.** The improvement to independent claim one, described as dependent claim three in the first application, appears as dependent claim two in the '527 patent as issued.

On February 12, 1992, the PTO rejected all eleven claims in Ault's application. The patent examiner rejected claim one and claims three through ten pursuant to 35 U.S.C. § 103 as unpatentable over prior art. Section 103 prohibits issuance of a patent if the prior art reveals "that the [newly-claimed] subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains."

The examiner found that prior art, viz., U.S. Patent No. 2,001,733 ("'733 patent"), discloses an acoustic ceiling roof panel assembly comprising, in relevant part, parallel and spaced flat sections separated by rib sections. The width of the base of the rib in the '733 patent is at least one third to one fifth the widths of the flat, "particularly when the relative dimensions are measured in the plane of the flat." February 12, 1992, Examiner's Action at 3. In addition to other similarities, the examiner considered the use of a plurality of corrugated panels an obvious expedient because "making into two parts or plural parts what was formerly one part is not considered patentably significant." Id. at 3–4.

Seeking to overcome the PTO's rejection, on April 8, 1992, Ault amended claims one, three, eight, and eleven. In claims one and eleven, Ault altered the width of the flat from at least three times greater to "within the range of three to five times greater than the width of the rib section as measured in the plane of the flat section." April 8, 1992, Amendment at 2. Ault also proposed three additional claims. Claim twelve improves the method of claim eleven, incorporating a flat width five times greater than the width of the rib "as measured in the plane of the flat section." Id. at 2.

In support of the amendments, the inventor noted the relative widths of the prior art's flat and rib sections as measured in the plane of the flat section. Ault compared the '733 patent's dimensions with those of his invention, illustrating that the width of the '733 patent's flat section is "far greater" than the ratio of the flat section to the rib section in his application. April 8, 1992, Amendment at 5. Ault argued that the flat/ rib width "specific ratio is an essential part of the Applicant's invention." Id. According to the inventor, use of a flat width from three to five times greater than the rib width, "when measured in the plane of the flat section," greatly enhances the acoustic properties of the roof panel. Id. Ault argued that the prior art, pursuant to which the examiner rejected the application, fails to suggest or teach the specific ratios in the current claim.

The PTO rejected all fourteen claims on May 15, 1992, finding, among other details, that the '733 patent discloses perforated flat sections separated by "rib sections one inch wide on six inch centers." May 15, 1992, Final Rejection at 2. The corrugation described by the '733 patent exists within the range specified in Ault's claims. The examiner labeled Ault's amendments obvious, his arguments tautological, and his claims unpatentable. The PTO classified the rejection as a final action.

The inventor filed a "Response After Final Rejection" on June 9, 1992, in which he thanked the examiner for discussing by telephone, subsequent to the most recent rejection, "the ratio of the width of the flat section and width of the rib section as measured in the plane of the flat section." Response After Final Rejection at 1. Ault also reiterated the necessity of the flat/rib width ratio for improved acoustic properties. Id. at 2.

The response included a reproduction of figure 3, a drawing supplied by Ault in the original application. Ault added reference characters to the illustration to "clarify the claimed features." Response After Final Rejection at 2. The drawing shows a flat width ($y$), the plane of the flat ($p$), and the width of the rib as measured in the plane of the flat ($x$). The response, through its drawing, discloses that the width of the rib, as measured in the plan of the flat, equals the distance between the rib walls at the location they diverge from the flat sections. Consequently, the width of the rib as measured in the plane of the flat is more narrow than the width of the rib at the juncture of the rib walls and rib top, its widest point.

The response contrasts the illustration of the invention with a perspective view of the '733 patent. Ault also supplements the '733 patent drawing with reference characters noting the width of the flat ($B$) and rib ($A$) sections and the plane of the flat

section (*P'*). Through this drawing, Ault demonstrates the examiner's error in concluding that the width of the rib of the '733 patent, as measured in the plane of the flat, teaches Ault's claims. According to Ault, only by measuring the width of the '733 patent's rib at the top, its widest point, can the examiner find the rib width within the specific ratio offered by Ault. Thus, the measurement of the rib width of both the '733 patent and Ault's invention in the plane of the flat section distinguishes Ault's invention from the prior art. "The specific ratio of the flat section to the width of the rib in the plane of a flat section as set forth in the claims is not taught or suggested in the ['733] patent or any of the prior art of record." June 9, 1992, Response After Final Rejection, p. 5.

Based, at least in part, upon the inventor's persistent arguments, on June 29, 1992, the PTO issued its "Notice of Allowability and Notice of Allowance" and required the inventor to add the character notations to the invention's drawing. The PTO also closed the patent prosecution and assigned the invention U.S. Patent No. 5,172,527.

### Analysis

■ A patent case comprises two elements. The first, construction of the patent's scope and meaning, is a question of law.[5] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996). The second, determination of whether infringement occurred, is a question of fact for resolution by the jury. *Id.* For clarity, the Court limits this order to construction of the disputed claims of the '527 patent.

■ The Court examines evidence intrinsic to the patent to discover the meaning of the patent claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996). The patent's claims, specification, and prosecution history, "the most significant source[s] of the legally operative meaning of claim language," constitute the intrinsic evidence available to the Court. *Id.* Proper patent construction relegates extrinsic evidence (*e.g.*, expert testimony, treatises, mat-

ters outside the disputed patent) to a secondary and generally supplemental status. *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1152–53 (Fed.Cir.1997)(construing the claim "greater than 3% elasticity"). The Court must not rely on extrinsic evidence to contradict otherwise unambiguous intrinsic evidence.

■ The words of the claims provide the paramount definition of the scope of the patented invention. *Vitronics*, 90 F.3d at 1582; *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed.Cir.1995). In a patent document, unless the patent and prosecution history reveal that the inventor used the terms and phrases otherwise, technical terms and phrases retain the meaning that persons learned and experienced in the field of the invention attach to them in exchanges with others learned and experienced in the same art. *CVI/Beta*, 112 F.3d at 1146, 1153. To accord a phrase a definition with which it is not ordinarily associated in learned discourse, the patent specification or file history must clearly state and adopt the special definition. *Vitronics*, 90 F.3d at 1582. In other words, if in learned discourse the inventor elects to impart an extraordinary meaning to a term or phrase, he must declare his intention to be an independent "lexicographer." *Id.*

■ The Court must "review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. The specification serves as a dictionary for the claims when the specification expressly[6] defines terms or phrases in the claims in a manner inconsistent with their ordinary usage. *Id.* If the specification fails to define or clarify a disputed term or phrase, the Court turns to the prosecution history. *Id.* Arguments by the inventor during the prosecution assist the Court in interpreting every claim of the patent, "absent a clear indication to the contrary." *Southwall*

---

**5.** A patent is a fully integrated written instrument and "uniquely suited" for having its meaning determined entirely by the Court as a matter of law. *Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 978 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

**6.** The '527 patent specification fails to expressly define the contested phrase.

*Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed.Cir.), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The prosecution history also limits the interpretation of the claim, excluding any interpretation disclaimed during the prosecution. *Id.*

■ At issue in the parties' papers is the meaning of the claim phrase, "as measured in the plane of the flat section." The phrase teaches the location at or in which to measure the width of the "rib section" of the invention. The defendants argue that, as measured in the plane of the flat section, the rib section width is the distance between corners formed by the rib's diverging side walls and the adjoining flat sections. The plaintiff contends that the width of the rib section is the rib's widest portion (the top wall of the rib) and that the observer should transpose the dimension of the widest portion to the plane of the flat for measurement. Neither interpretation invalidates the patent.

The plaintiff's suggested interpretation is inconsistent with the ordinary usage of the disputed phrase. The plaintiff suggests extracting the measurement of the rib section at its widest point and measuring that width in the plane of the flat. However, the claim language directs the reader to determine the relative dimensions of the flats and ribs only by calculating the width of the rib "in the plane of the flat." The unambiguous claim language supports the defendants' interpretation. Consequently, the Court must look to the specification and, to a lesser extent, the prosecution history to determine whether the inventor defined "as measured in the plane of the flat section" differently from its ordinary meaning. *Vitronics*, 90 F.3d at 1582.

Neither the "summary of the invention" nor the "descriptions of the preferred embodiment" yields an express or implied definition for the phrase at issue. The inventor's preferred embodiment describes a typical flat and rib width dimension (5 ½ inch and 5/8 inch, respectively) inconsistent with both the language of the claims and Epic's proffered interpretation of the claim language.[7]

■ Although the Court interprets claim language in light of the specification, the Court should not read limitations from the specification into the claim. *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed.Cir.1988). Nor, generally, can preferred embodiments limit the claims of a patent. *CVI/Beta*, 112 F.3d at 1159; *Constant v. Advanced Micro–Devices Inc.*, 848 F.2d 1560, 1571 (Fed.Cir. 1988). Accordingly, the specification yields no legally cognizable or atypical definition for the phrase "as measured in the plane of the flat section."

The Court's review of the prosecution history casts further doubt on Epic's interpretation. Ault's initial application alternatively claims a flat width both at least three times and at least five times the width of the rib section as measured in the plane of the flat section. The PTO examiner found that Ault's width dimensions read on prior art's (the '733 patent) relative dimensions. The '733 patent shows the width of the "base" of the rib section "at least one third to one fifth" the width of the adjoining flat sections, "particularly when the relative dimensions are measured in the plane of the flat section." February 12, 1992, Examiner's Action at 3.

Responding to the examiner's rejection, Ault filed an amendment limiting the flat dimension to "a width within the range of 3 to 5 times greater than the width of the rib section as measured in the plane of the flat section." April 8, 1992, Amendment at 4. Ault distinguished the '733 patent from his invention by illustrating that the cross-sectional shape of the '733 patent's rib was more triangular than the '527 patent's frusto-pyramidal shape, thus by definition decreasing the distance between the flat sections. The inventor argued that "[t]his ratio of the width of the flat section to the width of the rib

---

7. The inventor's initial application provided the preferred embodiment, including the "typical" dimensions. The initial application also described flat section dimensions having "a width *at least three times greater than the width of the rib*" and "a width *at least five times greater than the width of the rib*" as measured in the plane of the flat. '527 Patent Application (emphasis added). Thus the initial claims described the preferred embodiment. However, the examiner found the initial claims unpatentable, and the ensuing changes failed to include the preferred embodiment. Consequently, the preferred embodiment describes an invention outside the scope of the '527 patent.

section when measured in the plane of the flat section is an essential feature of the Applicant's invention ... not taught or suggested in the prior art." April 8, 1992, Amendment at 7. The amendment thus limited the ratio and reiterated the importance of measuring the rib section at its narrowest width.

Ault's "Response After Final Rejection" provides the most probative evidence of his efforts to overcome prior art. As in his amendment, Ault describes the importance of the ratio of the flat to the rib as measured in the plane of the flat. The "Response After Final Rejection" goes so far as to add reference characters to a cross-section diagram "to further clarify the claimed features." Response After Final Rejection at 2. The diagram unequivocally shows the width of the rib section as the distance between the adjoining flat sections or, in other words, the narrowest part of the rib.

The "Response After Final Rejection's" diagram of the '733 patent, with reference characters added by Ault, denotes the measurement of the '733 rib section as the space in the plane of the flats between flat sections. To overcome the examiner's rejection, Ault contrasts the rib width dimensions shown on the two diagrams and asserts that the '733 patent fails to disclose a flat section width within the range of three to five times the width of the narrowest portion of the '733 patent's rib section as measured in the plane of the flat.

Ault's persistence in distinguishing the relative widths of the narrowest portions of the '527 and '733 patents convinced the examiner to allow Ault's claims. The PTO directed Ault to add the lead lines and notation (reference characters) "to the specification and drawings" to conform the application with "37 CFR 1.75(d), 37 CFR 1.81 and 37 CFR 1.83." June 29, 1992, Notice of Allowability. Also on June 29, 1992, the PTO allowed the application for issuance as a patent, closing prosecution on the merits.

After the PTO allowed issuance of the patent, the inventor submitted drawings with lead lines and reference characters. However, those required notations failed to match the reference characters the inventor used to overcome the examiner's rejection. Instead, the inventor transferred the reference character denoting rib width to the top wall (the widest dimension) of the rib section. Along with the altered drawings, Ault submitted an "Amendment After Allowance" that, without elaboration, attempted to amend the specification "to remove an apparent inconsistency within the disclosure." July 22, 1992, Amendment After Allowance at 2. However, no inconsistency exists. The amended claims and drawings provided with the "Response After Final Rejection" disclose the measurement of the rib section at its narrowest—in the plane of the flat.

Ault's "Amendment After Allowance" sought to alter the method for determining the relative dimensions of the flat and rib sections. Noting that the width of the ribs "may or may not be measured in the plane of the flats," Ault asked the PTO to disregard all "arguments previously presented" to the extent that the arguments support measuring the width of the rib only in the plane of the flat section. July 22, 1992, Amendment After Allowance at 14. For the first time, Ault informed the PTO that the widest portion of the ribs section, not the open space between the flat sections, delineated the width of the ribs.

The "Amendment After Allowance" concludes with an assertion unsupported by any portion of the prosecution history. Ault claimed that the "Amendment does not affect the scope of the independent claims, and no new matter is being entered since the relative distances were described in the disclosure and illustrated in originally submitted Fig. 3." However, Figure 3, the cross-section of the '527 patent, disclosed a rib section measured only in the plane of the flat that is substantially narrower than the widest portion of the ribs.

The PTO disapproved the Amendment After Allowance, recognizing that the inventor sought to change that which he had previously called the "essential feature of the Applicant's invention." April 8, 1992, Amendment at 7. The PTO also dismissed Ault's subsequent "Petition For Withdrawal" and processed the '527 patent.

Consequently, the prosecution history supports the defendants' interpretation of the patent. The PTO's record contains the inventor's representations and disclaimers.[8] Because from the time of application until

allowance of the claims Ault disclaimed measurement of the rib section on the top wall of the rib, the prosecution history limits the claim interpretation so as to exclude measuring the ribs at their widest point. *Vitronics,* 90 F.3d at 1582–83; *Southwall,* 54 F.3d at 1576.

### Continuation–In–Part Patent

■■■■ Epic argues that the prosecution history of the '157 patent, a continuation-in-part of the '527 patent, confirms Epic's interpretation of the '527. Epic offers the affidavit of the former Commissioner of Patents and Trademarks in support of that contention. Although the defendants' fail to challenge the propriety of recourse to the '157 patent and accompanying affidavits to construe the '527 patent, the Court's examination of the evidence is very limited. The Federal Circuit defines "intrinsic evidence" as including only the patent's claims, specification, and prosecution history. *Bell & Howell Document Management Prod. Co. v. Altek Systems,* 132 F.3d 701, 705 (Fed.Cir. 1997). Intrinsic evidence constitutes the public record, allowing competitors to review the scope of the invention, avoid infringement, and design around the claims. *Vitronics,* 90 F.3d at 1583. On the other hand, "[e]xtrinsic evidence consists of *all evidence external to the patent and prosecution history,* including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 980 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)(emphasis added). The Court concludes that both the affidavit and the '157 patent, including its claims, specification, and prosecution history, amount to extrinsic evidence.

■■■■ The Court employs extrinsic evidence, if at all, to assist in understanding the patent and not for the purpose of varying or contradicting the terms of the patent's claims. *Id.* 52 F.3d at 981. The Court's use of extrinsic evidence to change the public record impedes or precludes competitors' ability to rely on the patent file. *Vitronics,* 90 F.3d at 1583. "A patentee may not proffer

an interpretation for the purposes of litigation that would alter the indisputable public record consisting of the claims, the specification [,] and the prosecution history, and treat the claims as a 'nose of wax.' " *Southwall,* 54 F.3d at 1578 (quoting *Senmed, Inc. v. Richard–Allan Med. Indus., Inc.,* 888 F.2d 815, 819 n. 8 (Fed.Cir.1989)).

Finding no ambiguity, the Court reviews and rejects extrinsic evidence, including the '157 patent, everything within its file wrapper, and expert opinions on the meaning of the '157 patent's prosecution history. Recourse to the subjective and ambiguous comments of the '157 patent's examiner disserve the public's right to rely on the '527 patent's language.

Upon consideration of the '527 patent claims, specification, and prosecution history, the Court concludes that "as measured in the plane of the flat section" means the measure of the distance between the rib walls at the point where they adjoin and diverge from the '527 patent's flat section. This measurement constitutes the narrowest portion of the rib cross-section. The intrinsic evidence fails to support the plaintiff's proposed measurement of the width of the top wall of the rib section in a plane parallel to the plane of the flat section.

### Infringement of the '527 Patent

■■■■ The determination of whether infringement occurred is a question of fact. *Markman,* 517 U.S. 370, 116 S.Ct. at 1393. Summary judgment is appropriate only where the record evidences no genuine issue of material fact. The parties' papers reveal no dispute regarding the relative dimensions of Epic's and defendant Consolidated Systems' respective acoustic deck panel assemblies. Consequently, the Court finds no material factual issue precluding summary judgment with respect to infringement of the '527 patent.

Consolidated Systems' Versa–Dek assembly consists of alternating rib and flat sec-

---

**8.** *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 12 Otto 222, 26 L.Ed. 149 (1880), states that:

Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his [be]half, when his application for the original patent was pend-

ing.... [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, ... such a construction may be confirmed by what the patentee said when he was making his application.

tions, creating a corrugated roof panel visually similar to Epic's. However, the ratio of the relative widths of the flat and rib section differs from Epic's product. Consolidated Systems' width ratio is 11.25 (5.625 inch flat width /0.5 rib width) when measured as taught by the '527 patent ("in the plane of the flat"). Consequently, the Consolidated Systems flat/rib ratio exists comfortably outside the ratio (3 to 5) disclosed in Epic's '527 patent. Accordingly, the defendant's Versa–Dek roof assembly panel with a 11.25 width ratio does not infringe Epic's '527 patent. The defendants' motion for partial summary judgment (Doc. 98) is **GRANTED.** The Court **DEFERS** ruling on the plaintiff's motion for partial summary judgment (Doc. 75).

APPENDIX A

**U.S. Patent**     Dec. 22, 1992     Sheet 1 of 2     **5,172,527**