BELL & HOWELL DOCUMENT MAN-
AGEMENT PRODUCTS COMPA-
NY, Plaintiff–Appellant,

v.

ALTEK SYSTEMS, Defendant,

and

Keystone Jackets, Inc. and George
Wrabel, Defendants–
Appellees.

No. 97–1226.

United States Court of Appeals,
Federal Circuit.

Dec. 5, 1997.

Rehearing Denied Jan. 6, 1998.

J.M.(Mark) Gilbreth. Also on brief was N. Elton Dry, Dry & Stacy, L.L.P., Houston, TX.

Before ARCHER, Chief Judge, MICHEL and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Bell & Howell Document Management Products appeals from the denial by the District Court for the Northern District of Illinois of a motion for a preliminary injunction against Keystone Jackets under U.S. Patents 4,452,666 and 4,523,401. *Bell & Howell Document Management Prods. Co. v. Altek Sys.*, No. 96–C–3385, 1996 WL 604048 (N.D.Ill. Oct. 18, 1996). Because the district court erred in construing the claims of the patents, and also erred in finding that a decline in the market for the patented product was a factor weighing against the issuance of a preliminary injunction, we vacate and remand.

William A. Streff, Jr., Kirkland & Ellis, Chicago, IL, argued for plaintiff-appellant. With him on brief were David K. Callahan, Anne V. Pellegrini, Chicago, IL, and Jay I. Alexander, Washington, DC.

Robert W. Strozier, Gilbreth & Strozier, P.C., Houston, TX, argued for defendants-appellees. With him on brief was

## BACKGROUND

The '401 and '666 patents[1] pertain, respectively, to jackets for holding microfiche strips and to a method for producing such jackets. The jackets are constructed of transparent top and bottom panels held together by "in situ ribs" of plastic. A plan and cross-sectional view of the jacket appear in Figures 1 and 2 of the patents, shown below:

1. The '401 and '666 patents are continuations of the same application and have the same written descriptions.

As explained in the patents, strips of molten plastic are first extruded onto the bottom panel and then the top panel is placed on top of the strips. When the strips cool, they form *in situ* ribs 12–17. These ribs function to hold the top 11 and bottom 10 panels of the jacket together and to form channels A–E within the jacket in order to accommodate the microfiche strips. The thickness of the ribs dictates the thickness of the microfiche strips that can be placed inside the jacket (through slots 10A–10E).

The '401 and '666 patents each contain only one independent claim. For purposes of this appeal, the key limitation in each claim is that the *in situ* ribs are required to be "integrally bonded ... free of adhesive"[2] to the panels.

As the district court noted in its order, Bell & Howell is a subsidiary of a large corporation that has sold over two billion microfiche jackets and enjoys annual sales of $800 to $900 million. In contrast, Keystone is a much smaller company having sales in 1995 of only $140,000. The microfiche industry is said to be under intense attack by the optical disk storage (CD ROM) industry, and a Bell & Howell representative has testified that competition from these newer technologies will eliminate the microfiche market over the next three years.

Bell & Howell sued Keystone, its president George Wrabel, and Altek Systems[3] alleging, *inter alia*, infringement of the '401 and '666 patents, and moved for a preliminary injunction. The court held a preliminary injunction hearing in which it received evidence relevant to the construction of the claims and to infringement. Keystone conceded the patents' validity for purposes of the preliminary injunction motion.

The hearing focused on the meaning of the expression "integrally bonded ... free of adhesive." In construing the claims, the court considered the patents' specifications and prosecution histories, and the testimony of expert witnesses. Keystone offered the testimony of Dr. Robin McCarley, a professor of chemistry, and Bell & Howell offered the testimony of Dr. John Muzzy, a professor of chemical engineering. McCarley testified that there are several types of bonding in the field of chemistry, including "mechanical

2. Claim 1 of the '401 patent (with the disputed claim language emphasized) reads as follows:

> 1. A multi-channel transparent jacket for accommodating microfilm strips having a predetermined thickness and a predetermined width and whose length is no greater than the length of the jacket, said jacket comprising:
>> (A) top and bottom rectangular panels in superposed relation formed of flexible, polyester film having predetermined polymeric properties; and
>> (B) a plurality of in situ ribs formed of moldable plastic material compatible with the material of said panels and *integrally bonded* thereto to form a unitary structure *free of adhesive* or other bonding agents and in which the properties of said panels are unimpaired, said ribs maintaining said panels in parallel planes to define open-end channels whose width is substantially equal to the width of said strips, said ribs having a thickness substantially equal to the thickness of said strips, each channel having an entry slot cut into said bottom panel adjacent the front end of the jacket.

Claim 1 of the '666 patent (with the disputed claim language emphasized) reads as follows:

> 1. A method of producing individual multi-channel transparent jackets for accommodating microfilm strips having a predetermined thickness and width, each jacket being composed of front and rear rectangular panels in superposed relation formed of flexible transparent polyethylene terephthalate film having predetermined polymeric properties, the method comprising the steps of:
>> (A) directing a plurality of spaced extruded molten streams of moldable polyester material ... onto the surface of a first web ... [;]
>> (B) advancing said first web carrying said streams concurrently with a second web of panel material into combining rolls having an adjustable nip ...;
>> (C) adjusting said nip with reference to the cross-sectional area of the streams to effect compression and flattening thereof between said webs ... to a degree forming in situ ribs ... being *integrally bonded* to each of said webs to create a unitary combined web *free of adhesive* and other bonding agents ...; and
>> (D) transversely sectioning said combined web to form open-ended channels in a stip-receiving [sic] condition, thereby defining said individual jackets.

3. As explained in the district court's order, Altek apparently had an agreement with Keystone to manufacture, market, and sell microfiche jackets, but did not participate in the district court's preliminary injunction hearing; no relief was sought against it. Altek is likewise unrepresented in this appeal.

bonding" and "integral bonding." He explained that "mechanical bonding" occurs between two substances when one flows into and fills the "nooks and crannies" on the surface of the other and then hardens, such that the hardened substance is anchored to the other. In contrast, "integral bonding" results when the molecules of the two substances cross the interface between them and "intermingle" such that the interface is obliterated. Thus, Keystone argued that because its jackets have a clearly discernible interface between the ribs and panels with no intermingling of the rib and panel materials, their jackets involve "mechanical," not "integral," bonding and do not infringe either of the claims.

Muzzy testified for Bell & Howell that Keystone's jackets were "integrally bonded" as that term is defined in the patents. He later clarified his position in an affidavit, in which he explained that the patents disclose a bonding in which the rib material itself serves as the adhesive without the use of separate layers of adhesives or bonding agents. Muzzy's affidavit explained further that the term "integrally bonded" was used by the patentee to distinguish over the paper-ribbed prior art in which adhesives were used to secure pre-formed paper ribs to the panels. In effect, Muzzy, while not arguing with McCarley's definitions of "integrally bonded" and "mechanically bonded" generally, argued that the term "integrally bonded" as used by the patentee in the '401 and '666 patents should be construed in the mechanical sense.

The court essentially adopted Keystone's construction. In support, the court noted that it is clear "that chemists have a clear definition of 'integral bonding.' It means exactly what both Dr. Muzzy and Dr. McCarley agreed that it means: that the two surfaces unite by an exchange of molecules so as to obliterate the interface between them." The court further noted that the term "integrally bonded" could not be construed to mean bonded without adhesive, because this would render the claim language "free of adhesive" superfluous. The court thus "interpret[ed] the claims of the '401 and '666 patents for purposes of [the preliminary injunction] hearing to require actual integral bonding into a single unitary piece of material." Because the court found it clear that the rib of Keystone's accused product was mechanically rather than integrally bonded to the panels, it determined that Bell & Howell "failed to establish a clear likelihood of success in showing infringement of either the '401 or '666 patents."

The court also determined that the balance of hardships favored Keystone, a "fledgling" company that would be put out of business if a preliminary injunction issued, and that the much smaller Keystone could only cause limited harm to the much larger Bell & Howell. The court further determined that the impending erosion of the microfiche market in light of optical disk technologies would naturally eliminate competition between the litigants and minimize long term damage to Bell & Howell. Accordingly, the court denied Bell & Howell's motion for a preliminary injunction.

Bell & Howell appeals to this court, arguing that the district court erred in denying its motion for a preliminary injunction. We have jurisdiction pursuant to 28 U.S.C. § 1292(c)(1) (1994).

## DISCUSSION

■ The grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 (1994) is within the discretion of a district court. *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367, 37 USPQ2d 1773, 1775 (Fed.Cir.1996), *cert. denied*, —— U.S. ——, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997). A court's decision to deny a preliminary injunction will be overturned on appeal only upon a showing that the court "abused its discretion, committed an error of law, or seriously misjudged the evidence." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579, 219 USPQ 686, 691 (Fed.Cir.1983). An abuse of discretion may be established by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings. *Novo Nordisk*, 77 F.3d at 1367, 37 USPQ2d at 1775; *see also Polymer Techs., Inc. v. Bridwell*, 103 F.3d

970, 973, 41 USPQ2d 1185, 1188 (Fed.Cir. 1996).

As the moving party, Bell & Howell had to establish its right to a preliminary injunction based on four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of relative hardships tips in its favor; and (4) whether and how an injunction would impact the public interest. *Nutrition 21 v. United States,* 930 F.2d 867, 869, 18 USPQ2d 1347, 1348–49 (Fed.Cir.1991); *Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1451, 7 USPQ2d 1191, 1195 (Fed.Cir.1988).

## A. *Likelihood of Success:*

■ In order to demonstrate likelihood of success, Bell & Howell must show that, in light of the presumptions and burdens that will inhere at trial, it will likely prove that Keystone infringes its patents.[4] *See New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 882–83, 23 USPQ2d 1622, 1625–26 (Fed.Cir.1992). If Bell & Howell clearly established a likelihood of success, it was entitled to a rebuttable presumption that it would be irreparably harmed if a preliminary injunction were not to issue. *Polymer Techs.,* 103 F.3d at 973, 41 USPQ2d at 1188.

■ Literal infringement involves a two-step determination: the proper construction of the asserted claim and a determination whether the claim as properly construed reads on the accused product or method. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 34 USPQ2d 1321, 1326 (Fed. Cir.1995) (in banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). The first step, claim construction, is a question of law, which we review *de novo. Id.* at 979, 34 USPQ2d at 1329. We proceed accordingly.

■ Bell & Howell argues that the district court erred in construing the expression "integrally bonded . . . free of adhesive." Specifically, Bell & Howell argues that this expression means that the ribs adhere to the panels by themselves without the use of a separate layer of adhesive. Bell & Howell asserts that this construction is supported by the intrinsic evidence, *viz.,* the patents' specifications and file histories, *see Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82, 39 USPQ2d 1573, 1576–77 (Fed.Cir. 1996), and that the district court, despite this evidence, improperly relied on the expert testimony of McCarley and Muzzy to construe the expression otherwise.

Keystone responds that the court's construction was reasonable. In support, Keystone notes that both experts agreed that the term "integrally bonded" means that the rib and panel material must be "integrated," *i.e.,* mixed at the molecular level, and that nothing appears in the intrinsic evidence to suggest that the inventor intended to impart an extraordinary meaning to this phrase. Keystone also argues that the district court does not have to make a final interpretation of the claims to deny a preliminary injunction, and that, at this stage of the litigation, we should determine only if the court's claim construction provided an "adequate basis" for denying the preliminary injunction.

We agree with Bell & Howell that the court erred in relying on expert testimony to construe the expression "integrally bonded . . . free of adhesive" because the intrinsic evidence is clear and unambiguous. The intrinsic evidence supports Bell & Howell's claim construction, and the district court therefore erred as a matter of law in construing this expression to require an "exchange of molecules" between the rib material and the panel material.

■ When construing a claim, a court should look first to the intrinsic evidence, *i.e.,* the claims themselves, the written description portion of the specification, and the prosecution history. *See Vitronics,* 90 F.3d at 1582–83, 39 USPQ2d at 1576–77. The intrinsic evidence should usually be sufficient to enable one to determine the meaning of a claim term. *See Markman,* 52 F.3d at 986, 34 USPQ2d at 1335 (noting that "ideally

---

4. Usually, a patentee would also have to show that it would likely withstand any alleged infringer's challenge to the validity and enforceability of the patent. *See New England Braiding Co. v.* *A.W. Chesterton Co.,* 970 F.2d 878, 882–83, 23 USPQ2d 1622, 1625–26 (Fed.Cir.1992). However, Keystone contested only infringement in opposing the preliminary injunction motion.

there should be no ambiguity in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history" and citing the disclosure requirements of 35 U.S.C. § 112 (1994) in support). When the intrinsic evidence is unambiguous, it is improper for the court to rely on extrinsic evidence[5] such as expert testimony for purposes of claim construction. *Vitronics*, 90 F.3d at 1583, 39 USPQ2d at 1577. The rationale for this rule is that:

> [t]he claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence ..., such as expert testimony, would make this right meaningless. The same holds true whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims.

*Id.* at 1583, 39 USPQ2d at 1577 (quotations and citations omitted). The testimony of an inventor and his attorney concerning claim construction is thus entitled to little or no consideration. The testimony of an inventor often is a self-serving, after-the-fact attempt to state what should have been part of his or her patent application; the testimony of an attorney "amounts to no more than legal opinion—it is precisely the process of construction that the court must undertake." *Markman*, 52 F.3d at 983, 34 USPQ2d at 1332–33.

Once a dispute over claim construction arises, "experts" should also not be heard to inject a new meaning into terms that is inconsistent with what the inventor set forth in his or her patent and communicated, first to the patent examiner and ultimately to the public. Patents should be interpreted on the basis of their intrinsic record, not on the

testimony of such after-the-fact "experts" that played no part in the creation and prosecution of the patent. *See Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578, 34 USPQ2d 1673, 1680 (Fed.Cir.1995) ("[E]vidence extrinsic to the patent and prosecution history, such as expert testimony, cannot be relied on to change the meaning of the claims when that meaning is made clear by those documents."). Use of expert testimony to explain an invention may be useful. But reliance on extrinsic evidence to interpret claims is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence, *Vitronics*, 90 F.3d at 1584, 39 USPQ2d at 1578, *i.e.*, when the intrinsic evidence is "insufficient to enable the court to construe disputed claim terms." *Id.* at 1585, 39 USPQ2d at 1579. Accordingly, any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight. *Id.* at 1584, 39 USPQ2d at 1578 (citing *Southwall*, 54 F.3d at 1578, 34 USPQ2d at 1678); *Markman*, 52 F.3d at 983, 34 USPQ2d at 1333.

These patents do not suffer from the malady of ambiguous intrinsic evidence. The specifications set forth that the invention is an improvement over, *inter alia*, the paper-ribbed prior art because it does not use a separate adhesive layer between the ribs and the panels:

> In the jacket [of the prior art], preformed plastic or paper ribs are adhesively secured to the top and bottom panels. Hence, the ... ribs act as carriers for an adhesive agent to effect lamination.
>
> ....
>
> In view of the foregoing, it is the main object of this invention to provide a ... jacket for microfilm wherein the channels are defined by in situ ribs which are integral with the panels of the jacket....

'401 patent, col. 1, l. 51 to col. 2, l. 13; '666 patent, col. 1, l. 49 to col. 2, l. 13. The bond between the ribs and the panels in the inven-

---

5. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitron-*

*ics*, 90 F.3d at 1584, 39 USPQ2d at 1578. Prior art may also constitute extrinsic evidence. *See id.* at 1584–85, 39 USPQ2d at 1578–79.

tion disclosed in the specifications clearly does not involve a separate adhesive or other bonding agent, but rather fusion of the molten rib to a solid panel:

> These problems are overcome in the present invention by creating ribs ... in situ, streams of rib material in molten form being extruded and being sandwiched between the top and back [panels] in combining rolls, whereby the ribs are formed in place and fused to the panel, the resulting ribs being integrally bonded to the panels to form a unitary jacket structure free of adhesive or any other bonding agent.

'401 patent, col. 7, II. 6–15; '666 patent, col. 7, II. 8–16.

The prosecution history[6] also aids in construing the meaning of the disputed claim language. Several references in the prosecution history show that by using the term "integrally bonded," the patentee was attempting to distinguish its claims over the paper-ribbed prior art that used a separate adhesive layer between the ribs and the panels. *See, e.g.,* prosecution history, Serial No. 463,814 (Feb. 5, 1977) ("Clearly, a preformed rib which is joined by an adhesive substance to a panel is not 'integrally bonded' thereto, as called for in the claims...."). In response to the examiner's contention that the term "integrally bonded" could include the use of an adhesive, the patentee added the "free of adhesive" language: "[T]he expression 'adhesive-free' is intended to define more clearly and to point up the fact that the claimed product (wherein 'in situ ribs' are integrally bonded to the top and bottom panels) is characterized by the absence of undesirable adhesive." *Id.* (May 15, 1977); *see also id.* (Feb. 28, 1977) ("As pointed out in the remarks accompanying this amendment, the expression 'adhesive-free' is not a new limitation in the claim, but only serves to define more clearly the existing limitation 'integrally bonded.'"). This last statement (and others of similar effect) from the prosecution history makes it clear that the expression "integrally bonded ... free of adhesive" operates as a single limita-

tion. Therefore, the district court's conclusion that Bell & Howell's proffered claim construction would render the word "integrally" superfluous because being "free of adhesive" is already recited in the claims is not sustainable. Moreover, defining a state of affairs with multiple terms should help, rather than hinder, understanding. Being "integrally bonded" and "free of adhesive" are mutually reinforcing definitions rather than being superfluous.

The specifications and the prosecution history therefore provide clear indication of the meaning of the disputed claim language. Thus, the theoretical testimony of experts concerning the nature of chemical bonding, and referring to testing methods not even known when the patents' specifications were drafted, was totally unnecessary, merely creating confusion where none truly existed. Because the intrinsic evidence unambiguously defines the disputed claim limitation, the district court's reliance on the expert testimony of McCarley and Muzzy to contradict the intrinsic evidence when interpreting the claims was error. *See Vitronics,* 90 F.3d at 1583, 39 USPQ2d at 1577. We thus conclude that the intrinsic evidence unambiguously defines the expression "integrally bonded ... free of adhesive" to mean that the ribs bond to the panels without the use of a separate adhesive layer between the ribs and the panels. The court's contrary construction was legal error, leading to an abuse of discretion in denying the motion for a preliminary injunction.

### B. *Other Preliminary Injunction Factors:*

Bell & Howell also argues that the court erred in concluding that the balance of hardships favors Keystone. Specifically, Bell & Howell asserts that it was an abuse of discretion for the court to consider the relative sizes of the parties in assessing the propriety of preliminary relief, and that the court abused its discretion in concluding that the declining market for microfiche jackets is a factor weighing in Keystone's favor.

---

**6.** We refer to the prosecution history without reference to the patent to which it pertains, *i.e.,* the '401 or the '666. The parties have not drawn a distinction between these two patents and neither will we.

We do not agree that the court erred in considering the relative sizes of the parties. While it would have been error for the court to have relied exclusively on the size of the parties in determining the equities between the parties, the district court did not do so. The court did not merely take note of the parties' sizes, but rather considered the impact of a denial of a preliminary injunction to Bell & Howell and a grant of a preliminary injunction to Keystone. The court determined that Bell & Howell would sustain only minimal damage if a preliminary injunction did not issue, and that Keystone would be put out of business if a preliminary injunction did issue. This is a proper factor to be considered, *see Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683, 15 USPQ2d 1307, 1310 (Fed.Cir.1990), and its use does not constitute an abuse of discretion. However, the fact that Keystone is "small" and could be put out of business if a preliminary injunction issues does not insulate it from the issuance of a preliminary injunction if the other three preliminary injunction factors are sufficient to tip the scale in Bell & Howell's favor. *Id.* Small parties have no special right to infringe patents simply because they are small.

We do agree with Bell & Howell that the district court's determination that the declining microfiche jacket market favored Keystone was legal error and hence an abuse of discretion.[7] The district court noted: "According to Richard Bramley, plaintiff's Vice President of Operations, CD ROM or optical disk storage will, within 3 years, take over the document storage industry. This will eliminate competition between the plaintiff and defendants and minimize long-range damage to the plaintiff." This is not a sufficient basis for concluding that the equities favor Keystone and the court erred in considering it as such.

A patent entitles its holder to exclude others from practicing the claimed invention. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457, 7 USPQ2d 1191, 1200 (Fed.Cir. 1988). We explained in *H.H. Robertson* that:

> In matters involving patent rights, irreparable harm has been presumed when a clear showing has been made of patent validity and infringement. This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm.

*H.H. Robertson v. United Steel Deck, Inc.*, 820 F.2d 384, 390, 2 USPQ2d 1926, 1929–30 (Fed.Cir.1987), *overruled on other grounds by Markman*, 52 F.3d at 977, 34 USPQ2d at 1327. When, as here, the market for a patented product is in decline, the passage of time is particularly likely to irreparably harm the patentee. By the time the litigation is over, there may well be no market over which the patentee can exercise its patent right. A patentee is entitled to exclude others from the practice of its invention, even if noninfringing competition is taking away its market. While a patentee is not protected against noninfringing competition, it is protected against infringers even if its business is declining. Thus, it was legal error for the district court to conclude that market decline was a factor favoring Keystone.

Because the district court determined the likelihood of infringement based on an incorrect claim construction, we must remand for a determination whether Bell & Howell has shown that it will likely succeed in proving infringement. If so, in the absence of a challenge to invalidity, Bell & Howell would be entitled to a presumption of irreparable harm. *Polymer Techs.*, 103 F.3d at 973, 41 USPQ2d at 1188. We therefore vacate the district court's denial of the preliminary injunction and remand for a reconsideration of the motion for preliminary injunction in light of the proper construction of the expression "integrally bonded ... free of adhesive," *see, e.g., Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991, 27 USPQ2d 1516, 1521 (Fed.Cir.1993) (noting that the court's erroneous conclusion that plaintiff could not

---

7. While the district court apparently treated this issue as a question of "balance of the hardships" between the parties, we find it more relevant to "irreparable harm." *See H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390, 2 USPQ2d 1926, 1929–30 (Fed.Cir.1987), *overruled on other grounds by Markman*, 52 F.3d at 977, 34 USPQ2d at 1327.

establish a likelihood of success warrants a remand for reconsideration of preliminary injunction factors), and without weighing the fact that the microfiche market is declining as a factor against the issuance of a preliminary injunction.

## CONCLUSION

The district court erred as a matter of law in its construction of the claims of both patents and in concluding that the decline in the market for the patented product is a factor favoring the denial of a preliminary injunction. Both errors constitute an abuse of discretion. Therefore, the decision of the district court is

*VACATED and REMANDED.*